**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-4681**

───────────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

LARRY ALLEN CLAY, JR.,

        Defendant – Appellant.

───────────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Joseph R. Goodwin, District Judge.  (2:21-cr-00062-1)

───────────────

Argued:  May 8, 2026                             Decided:  August 3, 2026

───────────────

Before GREGORY, HARRIS, and RICHARDSON, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Gregory wrote the opinion, in which Judge Harris and Judge Richardson joined.

───────────────

**ARGUED:**  Timothy J. LaFon, CICCARELLO, DEL GUIDICE & LAFON, Charleston, West Virginia, for Appellant.  Jennifer Rada Herrald, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Moore Capito, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

───────────────

GREGORY, Circuit Judge:

A jury convicted Larry Allen Clay of various offenses arising from his sex trafficking of a minor. On appeal, Clay raises several challenges to his criminal trial and sentencing. His primary argument is that his defense attorney had an unwaivable conflict involving one of the United States's witnesses, rendering his trial proceedings fundamentally unfair. Clay also argues that the proceedings below violated his rights under the Speedy Trial Act, that the Government's evidence did not sufficiently prove interstate nexus or coercion, and that his sentence was procedurally unreasonable.

For the reasons that follow, we find no error in the district court's rulings, so we affirm Clay's conviction and his sentence.

I.

Clay was the Chief of Police in Gauley Bridge, West Virginia. C.H., the victim in this case, lived with her stepfather, Charles Legg, and his wife, Kristen Naylor-Legg. C.H. was seventeen years old at the time of the relevant events.

In June 2020, Clay offered Naylor-Legg $100 to have sex with C.H. Clay and Naylor-Legg had previously engaged in a sexual relationship. Though C.H. initially refused, Naylor-Legg told C.H. they would have no electricity or food without the money and threatened to kick C.H. out of the house if she refused Clay's proposition. C.H. eventually acquiesced.

Clay and Naylor-Legg arranged for Naylor-Legg to bring C.H. to meet Clay in Cane Branch, a remote area with no cell service. Naylor-Legg drove C.H. to the area. While wearing his Chief of Police uniform, Clay forced C.H. to perform oral sex on him. He then

2

had sex with C.H. on the police cruiser.  Naylor-Legg watched the entire time.  Afterwards, Clay gave Naylor-Legg $100 in cash and departed the area.

A few days later, Clay and Naylor-Legg again arranged for C.H. to have sex with Clay.  This time, they had sex in a restricted-access area used by the Gauley Bridge Police Department.  He again kept his police uniform on the entire time.  He forced C.H. to perform oral sex, performed oral sex on C.H., and then had sex with her.  Naylor-Legg again watched the entire time.  This time, Clay left without paying Naylor-Legg.

When C.H. turned 18, she moved out of her stepfather's house and reported Clay and Naylor-Legg's conduct to the Fayette County Sheriff's Office, where Clay was Deputy Sheriff.  The deputies immediately began investigating C.H.'s allegations.  That afternoon, the deputies asked to speak to Naylor-Legg about Clay.  Before Naylor-Legg spoke to the deputies, she and Clay spoke on the phone, and Clay told her to say that the only way she knew Clay was because Clay was buying firearms from her husband.  Naylor-Legg complied.  That day, once Clay learned of the investigation, he visited Sergeant James Pack of the Fayette County Sheriff's Office at his home on three occasions.  On the third occasion, he asked if Pack could make the investigation "go away."  J.A. 755–56.

In March 2021, Clay was arrested.  An initial indictment was returned against him in April 2021.

## A. Speedy Trial Violation

On July 1, 2022, just before trial was set to begin, Clay asked the court to continue trial because of an unavailable "essential witness."  J.A. 98.  The district court granted the motion the same day and continued trial to August 23, 2022.  Then, on July 15, 2022, Clay

3

filed a pretrial motion under Federal Rule of Evidence 412 seeking to admit evidence otherwise barred from admission under the Rape Shield Law. That same day, Clay filed another motion to continue due to an unavailable witness. On July 28, 2022, the district court granted Clay's motion and continued trial to December 13, 2022. The court found that time between August 23, 2022 and December 13, 2022 was excludable under the Speedy Trial Act. It did not rule on Clay's evidentiary motion.

On October 4, 2022, the United States filed a fourth superseding indictment. The fourth indictment added two obstruction charges not included in the initial indictment. Clay was arraigned on the fourth superseding indictment on October 14, 2022. The Government filed a fifth superseding indictment on November 1, 2022. When Clay was arraigned on the fifth superseding indictment, the district court set trial for January 17, 2023.

On December 24, 2022, Clay filed a motion to dismiss his case for "violating his speedy trial rights." J.A. 73. He argued that the 70-day speedy trial clock restarted on October 14, 2022, the day Clay was arraigned for the fourth superseding indictment, because the indictment contained a new charge. Because trial had not commenced within seventy days of the fourth superseding indictment—December 23, 2022—Clay argued that his rights under the Speedy Trial Act were violated and his charges should be dismissed. Clay added that the fifth superseding indictment did not reset the speedy trial clock because it did not add a new defendant or charge, whereas the fourth superseding indictment did.

The district court denied his motion. J.A. 100–01. The court noted that it continued trial to December 13, 2022 on Clay's motion, and that it had previously ordered the August 23, 2022 to December 13, 2022 time excluded. As a result, it did not have to again state

4

that it was excluding that time period. The district determined in the alternative that the fifth superseding indictment restarted the clock on November 14, 2022, when Clay was arraigned, bringing the January 17, 2023 trial date within the seventy-day time period. Either way, it found Clay's motion meritless.

### B. Potential Conflict of Interest

In March 2022, before trial commenced, the United States filed a notice of a potential conflict of interest. J.A. 27–32. The notice stated that two days before Naylor-Legg was scheduled to plead guilty, Clay's counsel, Sebastian Joy, had allegedly hired an investigator to meet with Naylor-Legg's husband, Legg. On a recorded jail call, Legg revealed that the investigator instructed him to tell Naylor-Legg to fire her attorney and withdraw from the plea agreement. Clay responded to the notice. The district court took no action on the alleged conflict of interest at the time.

In April 2023, on the eve of trial, Naylor-Legg sent a letter to the district court (1) stating that the prosecutor in her case forced her to make false statements as part of her plea agreement and (2) requesting a new lawyer. The district court held a hearing and granted her request for new counsel. A few weeks later, the United States filed a supplemental notice of potential conflict of interest. The notice stated that Joy appeared to remain in contact with Legg, as evidenced by jail calls between Naylor-Legg and other parties. *See* J.A. 111 (Naylor-Legg stating that "Clay's lawyer" is "always" in her husband's "ear"). The United States then met with Naylor-Legg, who confirmed that Legg was in regular communication with Joy, and that Legg and Joy had urged her to write the aforementioned letter to the court. During the meeting, Naylor-Legg recanted the

allegations in her letter and redoubled her insistence that the information in her plea agreement was true.

Joy responded that he had never spoken to Naylor-Legg and had limited communication with Legg. He attached screenshots showcasing the limited scope of his interactions with Legg. *See* J.A. 145–49.

Before the start of trial, the district court held an evidentiary hearing on the possible conflict of interest. Legg testified that Joy never indicated that Naylor-Legg should not enter into or should withdraw from the plea agreement. J.A. 164. But he also acknowledged that in recorded jail calls, he told his wife that Joy had provided him with information. J.A. 170–71. He also stated that Joy texted him that Naylor-Legg's hearing for new counsel "went great," alongside a picture of her new attorney. J.A. 171. And Legg affirmed that he had a jail call with Naylor-Legg where she told him to "[m]ake sure that Sebastian doesn't fuck with [her]," to which Legg responded, "I've already told him that." J.A. 171–72. When the United States asked why Naylor-Legg thought Joy could hurt her, Legg responded, "I don't know how he can hurt her. All I know is that I said what I said." J.A. 172. Legg described his prior statements to Naylor-Legg as "misinformation." J.A. 173.

Legg also mentioned that Joy's paralegal had informed Legg that Legg and Joy could help each other. J.A. 179–80. Joy denied any untoward communication. He testified that any communication with Legg was trial-related. J.A. 183. After the hearing, the district court stated that Legg's testimony was "quite incredible as to anything he said." J.A. 205.

During the hearing, Clay asked the court to allow him to keep Joy as his attorney. J.A. 187. The court responded that it would seriously consider Clay's request, but it noted that the right to counsel is "secondary" to the court's "duty to maintain the highest standards of professional conduct." J.A. 187.

Then, Naylor-Legg testified. She stated that she wrote the letter to the court asking for new counsel because she believed that Joy would "help her get out of jail"—Legg had told her Joy could do so. J.A. 192. Legg had also told her that Joy did not want her to take her plea. Naylor-Legg testified that she had never directly communicated with Joy.

After the hearing, the court ruled that, based on the totality of the circumstances, there was a potential conflict in the case requiring that Clay waive any potential conflict and consent to Joy's continued representation of him. J.A. 205. The court discussed the dangers of representation by an attorney with "divided loyalties" at length. J.A. 205–06. The court specifically emphasized that the conflict could impact Joy's ability to effectively cross-examine Naylor-Legg on the basis of her letter, which would be potentially exculpatory evidence for Clay. As the court explained, Naylor-Legg might testify that she wrote the letter for new counsel because Joy asked her to, thus impacting the "jury's view of his case and the credibility of [his] witnesses." J.A. 207. The court asked Clay to repeat the court's description of the risks of continuing forward with Joy as his counsel multiple times to confirm Clay's understanding. After conferring with Joy, Clay "knowingly, intelligently, and voluntarily" waived the potential conflict of interest. J.A. 209.

At trial, Naylor-Legg testified that she had lied in her phone calls to Legg about her innocence because she did not want him to know "the truth." J.A. 600. On cross, Naylor-

7

Legg again admitted that she lied multiple times to law enforcement and the United States. And she stated that she had "decided to start telling the truth" after taking her plea. J.A. 614. Joy did not impeach Naylor-Legg with the letter she sent to the district court claiming she had been coerced by the government to lie. J.A. 726. After Naylor-Legg testified, the district court again asked Clay whether he wanted to waive any possible conflict of interest with Joy because Joy had not impeached Naylor-Legg with the letter. J.A. 728. The court told Clay to take a 10-minute recess to confer with his counsel or confer with independent counsel regarding the waiver. J.A. 728. Clay conferred with Joy and independent counsel. After the recess, the district court asked Clay whether he still wanted to waive any possible conflict with Joy since he did not ask Naylor-Legg about the letter. Clay responded that his understanding was that bringing the letter up could result in a mistrial, which he did not want. J.A. 731. He then waived the potential conflict again. J.A. 731.

At the close of trial, the jury convicted Clay on all counts: four counts involving sex trafficking of a minor and one count of obstruction of justice. Joy, as Clay's counsel, then filed a Rule 33 motion for a new trial. In the motion, Clay argued violations of the Speedy Trial and that the Government put forth insufficient evidence of coercion. The district court denied the motion. Joy then withdrew as Clay's counsel.

Over a year later, Clay's new attorney, Timothy LaFon, filed a motion to reopen the time for post-trial motions and to allow Clay to file a motion for new trial/mistrial based on an "unwaivable conflict." J.A. 1044. The district court denied the motion to reopen as untimely, holding that a motion for new trial based on ineffective assistance of counsel must be filed within fourteen days of judgment. It also held that the one-page motion did

8

not show good cause for the court to extend the time period to file post-trial motions. J.A. 1140.

At the sentencing hearing, Clay objected to the district court's application of two sentencing enhancements: a two-level enhancement under U.S.S.G. § 2G1.3(b)(2) for exerting undue influence over C.H. and a two-level enhancement under U.S.S.G. § 2G1.3(b)(3) for use of a computer. The district court overruled Clay's objections, finding by a preponderance of the evidence that both sentencing enhancements applied. The district court then calculated Clay's sentence and determined that his offense level was 51, which the court reduced to 43, as required by the Guidelines. An offense level of 43 corresponds to a sentence of life in prison under the Guidelines. But the district court varied downward and sentenced Clay to 25 years in prison to be followed by a ten-year term of supervised release.

Clay timely appealed.

## II.

Clay raises six issues on appeal: four concerning his conviction and two concerning his sentence. We address those arguments in turn and provide additional factual context where necessary. Finding no error in the district court's rulings on Clay's claims, we affirm.

### A.

Clay's primary challenge is to the district court's ruling on his Rule 33 motion for a new trial due to an "unwaivable conflict." On appeal, Clay reiterates that a conflict like

9

the one he faced at trial cannot be waived, thus mandating reversal.  Relying on *Stanko v. Stirling*, 109 F.4th 681 (4th Cir. 2024) and out-of-circuit caselaw, Clay argues that the conflict he faced was so severe that the court's interest in fairness should have outweighed any interest Clay had in retaining his own attorney.

We review a denial of a motion for a new trial under Federal Rule of Criminal Procedure 33 for abuse of discretion.  *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021).

The district court properly denied Clay's motion to reopen post-trial motions, and therefore his motion for a new trial, as untimely.  Rule 33 permits a new trial "if the interest of justice so requires," and any motion for a new trial based on "newly discovered evidence must be filed within 3 years after the verdict or finding of guilt."  Fed. R. Crim. P. 33(a)-(b)(1).  "[A]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilt."  Fed. R. Crim. P. 33(b)(2).

After Clay fired Joy, Clay's new attorney, LaFon, filed a motion for a new trial over a year after the jury's verdict, in December 2024.  The sole argument in that motion was that Joy's representation of Clay posed an unwaivable conflict.  The district court, construing Clay's motion as one of ineffective assistance of counsel, determined that the motion was not based on newly discovered evidence.  *See United States v. Smith*, 62 F.3d 641, 651 (4th Cir. 1995) (holding that "facts giving rise to an ineffective assistance claim do not count as 'evidence' for purposes of Rule 33's time limit").  We agree; the district

10

court properly concluded that the motion should have been filed within 14 days of the verdict.[1]

And though Fed. R. Crim. P. 45(b)(1)(B) permits a district court to consider an untimely motion for new trial if the movant can show "good cause" and "excusable neglect," Clay failed to make that showing below or on appeal. Before the district court, Clay did not attempt to justify his late filing. Nor does he do so in his opening brief. In his reply brief, he notes in passing that his counsel dealt with a medical issue, which contributed to the delay in filing. Reply Br. at 4. Given the substantial latitude the district court has to accept an untimely motion for a new trial, the district court's denial of Clay's motion was not an abuse of discretion.

The district court did not address Clay's unwaivable conflict claim. But it also fails on the merits. A criminal defendant has a Sixth Amendment right to conflict-free counsel. *See Wood v. Georgia*, 450 U.S. 261, 271 (1981). And he may waive that right "so long as the waiver is knowing, voluntary, and intelligent." *Wilson v. Moore*, 178 F.3d 266, 279 (4th Cir. 1999). "Nothing limits a defendant's right to waive *his* right to conflict-free counsel; indeed, it is buttressed by his right to counsel of his choice." *Stanko*, 109 F.4th at 691. So whether a conflict is "unwaivable" implicates a separate interest: the *court's* interest in ensuring the proceedings before it are fair and ethical. *Id.* at 692. This interest, when it "outweighs the defendant's interest in choosing his lawyer," may justify "insisting

---

[1] As discussed in further detail below, an ineffective assistance of counsel claim is distinct from an "unwaivable conflict" claim, which implicates the district court's responsibility to ensure the proceedings before it are fair. But we nonetheless agree that Clay failed to proffer any newly discovered evidence to justify his untimely filing.

11

on conflict-free counsel even when a defendant would prefer to proceed with conflicted counsel." *Id.* In such cases, the court may be at liberty to "reject" a defendant's otherwise valid waiver or "without the discretion to accept" any waiver at all. *Id.*

The question is thus not whether Joy's representation of Clay violated Clay's Sixth Amendment rights, but whether the district court abused its discretion when it accepted Clay's waiver. In other words, Clay must demonstrate that the conflict posed by Joy's representation of him was so unwaivable that the district court "lacked discretion to accept even a fully informed waiver of [Clay's] right to conflict-free counsel." *Id.*

We have not defined the exact contours of when a district court should override a defendant's waiver. But, as we noted in *Stanko*, the bar is "set extremely high." *Id.* The Second Circuit, for instance, recognized such a conflict must be "so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation." *United States v. Lussier*, 71 F.3d 456, 461 (2d Cir. 1995). The Fifth Circuit has similarly stated that the conflict must be "so severe as to render a trial inherently unfair." *United States v. Vaquero*, 997 F.2d 78, 90 (5th Cir. 1993). And the district court has "'substantial latitude' in accepting and refusing waivers of conflicts of interest." *Stanko*, 109 F.4th at 692 (citing *United States v. Edelen*, 561 F. App'x 226, 232 (4th Cir. 2014)). We must weigh the trial court's broad discretion against the likewise robust right defendants have to waive their right to conflict-free counsel.

On the record before us, the conflict in this case does not fall into the "exceptional category" of an unwaivable conflict. *Id.* The Government's motion was based on Legg's calls to Naylor-Legg stating that Joy was constantly communicating with Legg and would

12

assist Naylor-Legg.  But, while on the stand, Legg essentially admitted that he fabricated Joy's advice to Naylor-Legg, and the district found him to be an incredible witness.  The texts between Joy and Legg also indicate that Legg misrepresented the scope of their communications:  Joy repeatedly told Legg he could not assist Naylor-Legg or provide advice because it would be unethical to do so.  *See* J.A. 146.  So, although Joy did not impeach Naylor-Legg with the letter she wrote—which the district court told Clay could happen—this does not seem to be a case where "a member of the public would be shocked to observe" the trial proceedings, *Stanko*, 109 F.4th at 692, or one where no rational defendant would consent to Joy's representation.

However, even if the conflict at issue was waivable, we must still determine whether Clay actually waived it:  whether his waiver was valid.  *See id.* at 693.  We have, on occasion, determined that a defendant's waiver was not valid because it was not given voluntarily, knowingly, and intelligently.  *Brady v. United States*, 397 U.S. 742, 748 (1970).  For example, in *Hoffman v. Leeke*, 903 F.2d 280, 289 (4th Cir. 1990), we recognized that a defendant's waiver was not intelligent because no one explained the potential conflict to the defendant.  That is not the case here.  The district court repeatedly told Clay that it believed there was a potential conflict between Clay and Joy, and it asked Clay to repeat the district court's description of the conflict and the risks involved to ensure Clay grasped the potential harms.  Clay emphasized that he wanted Joy to remain his counsel, and that he hoped the court would consider his preferences when assessing whether Joy's continued representation of Clay posed a potential conflict.  Then, when the conflict became real with Joy's choice not to impeach

13

Naylor-Legg, the district court again gave Clay the opportunity to waive any conflict. And Clay again stated that he wanted Joy as his attorney and waived any conflict.

In sum, the trial court "acted well within its considerable discretion" in respecting Clay's waiver. We see no reason to disturb the district court's denial of Clay's Rule 33 motion.

B.

Next, Clay argues that his trial did not commence within seventy days of the Government's fourth superseding indictment, requiring dismissal of his charges.

We review de novo whether the district court properly excluded a time period from the seventy-day trial clock under the Speedy Trial Act. *United States v. Pair*, 84 F.4th 577, 582 (4th Cir. 2023).

The Speedy Trial Act requires that a criminal trial begin within seventy days of the Government's filing of an information or indictment, "or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date occurs last." 18 U.S.C. § 3161(c)(1). However, "[t]o provide the necessary flexibility, the [Speedy Trial] Act includes a long and detailed list of periods of delay that are excluded in computing the time within which trial must start." *Zedner v. United States*, 547 U.S. 489, 497 (2006). Such periods of delay include delay resulting from any pretrial motion, 18 U.S.C. § 3161(h)(1)(D), and when a district court finds that a continuance serves the "ends of justice." *Id.* § 3161(h)(7)(A).

When determining if time is excludable under the Act's ends-of-justice exception, the district court must "set[ ] forth, in the record of the case, either orally or in writing, its reasons for finding" that a continuance serves the ends of justice. *Id.* The statute requires

14

the district court balance certain factors when undertaking its analysis. *Id.* § 3161(h)(7)(B). The district court need not put such findings in the record at the time it grants the continuance, so long as the findings are "put on the record by the time a district court rules on a defendant's motion to dismiss." *Zedner*, 547 U.S. at 497. And "it must be clear from the record that the court conducted the mandatory balancing contemporaneously with the granting of the continuance." *United States v. Henry*, 538 F.3d 300, 304 (4th Cir. 2008) (citation modified).

We recently recognized that "the filing of a superseding indictment does not reset the speedy-trial clock for offenses charged, or required to be joined with those charged, in the original indictment." *United States v. Myrick*, 150 F.4th 308, 314 (4th Cir. 2025) (citing *United States v. Young*, 528 F.3d 1294, 1296–97 (11th Cir. 2008)). But the clock for "new and different" charges—"charges not required by the Double Jeopardy Clause to be included with the original charge"—is "tied to the filing of the superseding indictment." *Id.* at 315.

On July 1, 2022, Clay moved to continue trial due to an unavailable witness. The court granted his motion and continued trial to August 23, 2022. Then, on July 15, 2022, Clay again moved to continue trial due to an unavailable witness. That same day, Clay filed a pretrial evidentiary motion seeking to admit evidence that is generally barred by the Rape Shield Law. The court did not rule on the evidentiary motion, but it granted Clay's continuance and set trial for December 13, 2022. It also found the August 23, 2022 to December 13, 2022 dates excludable under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(7), stating briefly that the ends of justice served by granting Clay's continuance

15

outweighed "the best interest of the public and the defendant in a speedy trial."  R. Doc. 202.  On November 14, 2022, when Clay was arraigned on the fifth superseding indictment, the district court set a new trial date of January 17, 2023.

On appeal, Clay is not challenging the underlying basis for the district court's initial determination that the August 23, 2022 to December 13, 2022 dates were excludable.  He instead contends that the clock reset after the arraignment for the fourth superseding indictment.  On October 14, 2022, when Clay was arraigned on the Government's fourth superseding indictment, the clock ostensibly reset because that indictment contained a "new and different" charge:  an obstruction of justice charge under 18 U.S.C. § 1512(c)(2) arising out of recently-discovered facts.  December 23, 2022 falls seventy days after October 14, 2022.  So Clay argues that the district court's failure to again find the August 23, 2022 to December 13, 2022 dates excludable was error, as the seventy-day clock ran on December 23, 2022.

We disagree.  Because a pretrial motion remained pending between July 15, 2022 and the start of trial, the clock never ran in Clay's case.

The Speedy Trial Act creates an exception for "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(D).  And the Supreme Court held that "the filing of a pretrial motion falls within [18 U.S.C. § 3161(h)(1)(D)] irrespective of whether it actually causes, or is expected to cause, delay in starting a trial."  *United States v. Tinklenberg*, 563 U.S. 647, 650 (2011).  The filing of a pretrial motion "automatically" stops the speedy trial clock from running.  *Id.* at 654.

16

Clay filed his pre-trial motion pursuant to Rule 412. Rule 412 specifies that "[b]efore admitting evidence under this rule, the court must conduct an in camera hearing and give the victim and parties a right to attend and be heard." Fed. R. Evid. 412(c)(2). Because that in camera hearing did not take place until the first day of trial—April 25, 2023—the clock did not begin to run until that date.

Thus, the speedy trial clock did not run between the dates of Clay's pretrial motion and the start of trial, so we affirm the district court's ruling.

C.

Clay additionally challenges whether the Government put forth sufficient evidence to prove the interstate nexus prong of 18 U.S.C. § 1591.

When considering "a sufficiency challenge, we view the evidence in the light most favorable to the prosecution and assume the jury resolved all credibility disputes or judgment calls in the government's favor." *United States v. Huskey*, 90 F.4th 651, 662 (4th Cir. 2024) (citation modified). We must uphold the jury's verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Madrigal-Valadez*, 561 F.3d 370, 374 (4th Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

18 U.S.C. § 1591 requires proving an interstate nexus: that the defendant engaged in commercial sex trafficking of individuals under the age of 18 "in or affecting interstate commerce." "The phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause." *Circuit City Stores v. Adams*, 532 U.S. 105, 115 (2001). Congress may also regulate "purely local activities that are part

17

of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (citation modified).

Clay contends that the Government relied on the phones and cars used to facilitate the sexual interactions to establish an interstate nexus, but that the Government did not prove that a car was used to facilitate the second instance of sex trafficking.

We need not reach the argument regarding the use of cars, because we agree with the district court that the use of phones and cellular networks to arrange intrastate criminal activity establishes an interstate nexus. We have not previously addressed the scope of the interstate nexus requirement in 18 U.S.C. § 1591, and whether use of phones or cellular networks satisfies it. But our sister circuits have uniformly held that intrastate use of phones to arrange criminal activity satisfies the interstate nexus requirement. *See, e.g.*, *United States v. Tovar*, 146 F.4th 1318, 1325–26 (11th Cir. 2025) (stating that defendant who used cell phone to arrange sex with minors satisfied § 1591's interstate nexus requirement even though minors were fictional and never crossed state lines); *United States v. Phea*, 755 F.3d 255, 266 (5th Cir. 2014) (affirming jury instruction that the use of telephones was sufficient to establish the interstate nexus in a § 1591 prosecution); *United States v. Koech*, 992 F.3d 686, 693 (8th Cir. 2021) (holding the use of telephones was evidence of interstate nexus for § 1591 prosecution).

We have also recognized that using a smartphone imported from China to produce child pornography in the United States suffices to establish an interstate nexus. *See United States v. Hoover*, 95 F.4th 763, 774 (4th Cir. 2024). And we have separately acknowledged that phones are "channels of interstate commerce," so use of phones satisfies the interstate

18

nexus requirement for that reason as well.  *United States v. Barronette*, 46 F.4th 177, 203 (4th Cir. 2022) (citing *Gibbs v. Babbitt*, 214 F.3d 483, 491 (4th Cir. 2000)).[2]

Viewing the record in the light most favorable to the Government, we affirm the district court's ruling.  Naylor-Legg testified that she and Clay organized both the encounters over the phone.  J.A. 571 (describing setting up the first sexual encounter during a phone call); J.A. 583 (describing arranging the second sexual encounter over the phone).  This evidence suffices to meet § 1591's interstate nexus requirement.

## D.

Clay also argues that the Government failed to put forth sufficient evidence that he coerced C.H. to have sex with him because Naylor-Legg was the individual who coerced C.H. to have sex with Clay.  Clay likewise claims that wearing a police uniform during the sexual encounters is not sufficient to establish coercion.

Because Clay raised this argument in his Rule 33 motion, we review the district court's denial of that motion for abuse of discretion.  *United States v. Rafeikian*, 68 F.4th 177, 187 (4th Cir. 2023) (citations omitted).  We may grant a motion for a new trial under Rule 33 if "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment."  *Id.* at 186.

---

[2] What's more, our sister circuits have held that even completely intrastate commercial sex satisfies 18 U.S.C. § 1591's interstate nexus requirement.  When aggregated with other, similar misconduct, "his acts contribute to the market that Congress's comprehensive scheme seeks to stop."  *United States v. Evans*, 476 F.3d 1176, 1179 (11th Cir. 2007) (citation modified); *see United States v. Willoughby*, 742 F.3d 229, 240 (6th Cir. 2014).

18 U.S.C. § 1591(a) makes it a crime for a defendant to act "knowing, or . . . in reckless disregard of the fact, that . . . coercion . . . will be used to cause the [victim] to engage in a commercial sex act."  Clay reads the statute to require that he be the one to directly coerce the victim.  But we find Clay's argument unavailing.  As the Eighth Circuit recognized, the language "will be used" in § 1591(a) clarifies that the coercion may be exerted by some other individual.  *See United States v. Collier*, 932 F.3d 1067, 1075–76 (8th Cir. 2019) (rejecting argument that government had to prove that defendant himself used force or coercion to cause victim to engage in a commercial sex act and holding that coercion may be used by any person, including a third party).

Naylor-Legg certainly pressured C.H. to have sex with Clay.  C.H. testified that she only met with Clay because she believed she had "no other choice in the matter":  she would be kicked out of her family house if she did not have sex with Clay.  J.A. 318.  When C.H. expressed how upset she was to Naylor-Legg, Naylor-Legg responded that C.H. "needed to do what it took to keep the lights on in the house."  *Id.*

But Naylor-Legg's involvement does not absolve Clay of liability.  Clay knew of Naylor-Legg's financial difficulties, and exploited them by offering Naylor-Legg money to facilitate intercourse with C.H.  C.H. and Naylor-Legg testified that Clay was wearing his full police uniform when he forced C.H. to have sex with him.  C.H. said she was "too scared" to say anything when Clay started "raping" her, in part because he was "in uniform."  J.A. 316.  When asked if she felt like she "could say 'no' during [the] encounter," C.H said she could not, in part because Clay was the Chief of Police.  J.A. 318.

20

She noted that she thought he would "hurt" her because if he thought "he [could] get away with this, who knows what he could have got away with" as the Chief of Police." J.A. 321.

Clay kept his full uniform on during sex, including his badge, his handcuffs, his gun, pepper spray, and his taser. J.A. 405–06, 314. At trial, two police officers testified that officers are taught that a uniformed officer's presence is itself "treated as a display of force" because police are "in a position of authority." J.A. 432; J.A. 745. The site of the second encounter also had a "Gauley Bridge Police" mural on the wall, reinforcing Clay's authority. J.A. 321–23.

Additionally, Naylor-Legg testified at trial that Clay chose the location of their first encounter: Cane Branch, an isolated area without cell service. C.H. testified that there isn't much foot or car traffic there, and there are no businesses or houses nearby. This reinforced C.H.'s sense that she was unable to say no, as no one would hear or see her.

In sum, the record is rife with evidence of direct and indirect coercion. We affirm the district court's denial of Clay's Rule 33 motion.

E.

Finally, Clay challenges the procedural reasonableness of the district court's sentencing determinations. We review the district court's legal conclusions in sentencing de novo and its factual findings for clear error. *United States v. Thornton*, 554 F.3d 443, 445 (4th Cir. 2009).

Clay argues that the district court erroneously applied two enhancements: a two-level enhancement for the use of a computer under U.S.S.G. § 2G1.3(b)(3) and a two-level

enhancement for undue influence under U.S.S.G. § 2G1.3(b)(2). Both of Clay's challenges pertain to the district court's factual findings, so we review them for clear error.

To apply the two-level enhancement for computer use, the district court must find, by a preponderance of the evidence, that the defendant used a computer or interactive computer service to facilitate the sexual conduct. Naylor-Legg testified at trial that she used a phone to arrange the sexual encounters, and in her guilty plea, she stipulated that she used a cell phone. *See* J.A. 571, J.A. 583, J.A. 1104. The district court concluded that her cell phone—an iPhone—permitted application of the computer enhancement.

Its determination was not clearly erroneous. We have not determined whether a smartphone is a computer under U.S.S.G. § 2G1.3(b)(3). But other courts have. In *United States v. Kramer*, 631 F.3d 900 (8th Cir. 2011), the Eighth Circuit held that a defendant's cell phone—though it lacked Internet access—was a computer under § 2G1.3(b)(3). *See also United States v. Hill*, 783 F.3d 842, 845 (11th Cir. 2015). And we have recognized that smartphones are "minicomputers that also happen to have the capacity to be used as a telephone." *United States v. Hoover*, 95 F.4th 763, 774 (4th Cir. 2024) (citing *Riley v. California*, 573 U.S. 373, 393 (2014)). Thus, relying on our precedent and that of our sister circuits, the district court did not clearly err in applying the computer use enhancement to Clay's sentence.

As to the undue influence enhancement, Clay argues that the Government failed to establish undue influence because Clay "had no direct contact with the alleged victim." Opening Br. at 33. The district court found that Clay's argument failed to rebut the presumption of undue influence established by the age gap between Clay and C.H.

22

Here, too, we see no clear error in the district court's sentencing enhancement application. The Guideline commentary for U.S.S.G. § 2G1.3(b)(2) states that "[i]n a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies" because "some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor." U.S.S.G. § 2G1.3, cmt. n. 3(B). Given that Clay was 54 and C.H. was 17 at the time of the sexual encounters, the court did not err in finding that presumption unrebutted by Clay's thin argument.

Thus, the district court did not clearly err in applying either sentencing enhancement.

### III.

We affirm the district court's rulings on all grounds.

*AFFIRMED*